UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:                                                    Case No. 12-12129

        FILLPOINT, LLC,                                   Chapter 11

               Debtor.

## DISCLOSURE STATEMENT
## FOR PLAN OF REORGANIZATION OF FILLPOINT, LLC

### ARTICLE 1
### INTRODUCTION

Fillpoint, LLC, (the "Debtor"), as Debtor and Debtor-in-Possession submits this Disclosure Statement pursuant to Bankruptcy Code Section 1125 for use in the solicitation of votes on the Plan of Reorganization (the "Plan").

This Disclosure Statement sets forth certain relevant information regarding the Debtor's prepetition operations and financial history, the need to seek Chapter 11 protection, significant events that have occurred during the Chapter 11 case, an analysis of the expected return to the Debtor's unsecured creditors and the anticipated procedures for liquidating the Debtor's remaining assets. This Disclosure Statement also describes terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. Additionally, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims and Interests must follow for their votes to be counted.

## A.     Filing of the Debtor's Chapter 11 Case

The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 14, 2012 (the "Petition Date") in the United States Bankruptcy Court for the Northern District of New York, Albany Division (the "Bankruptcy Court"). Since the Petition Date, the Debtor has continued to operate its business and manage its properties and assets as Debtor-in-Possession pursuant to Bankruptcy Code Sections 1107 and 1108.

## B.     Purpose of Disclosure Statement and Hearing for Approval

Section 1125 of the Bankruptcy Code requires the Debtor to prepare and obtain court approval of a Disclosure Statement as a prerequisite to soliciting votes on the Debtor's Plan. The purpose of the Disclosure Statement is to provide information to

Creditors and Interest holders (shareholders) that will assist them in deciding how to vote on the Plan.

The Bankruptcy Court has set **August 28, 2013, at 10:30 a.m.** as the date for a hearing to approve the Disclosure Statement. Such approval does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereunder. The Court's approval does indicate, however, that the Bankruptcy Court has determined that the Disclosure Statement contains adequate information to permit you to make an informed judgment regarding acceptance or rejection of the Plan.

**This Disclosure Statement is Not Being Solicited Unless and Until Approved by the Bankruptcy Court. The Approval By The Bankruptcy Court Of This Disclosure Statement Does Not Constitute An Endorsement By The Bankruptcy Court Of The Plan Or A Guarantee Of The Accuracy Or Completeness Of The Information Contained Herein. The Material Contained Herein Is Intended Solely For The Use Of Creditors And Holders Of Interests Of The Debtor In Evaluating The Plan And Voting To Accept Or Reject The Plan And, Accordingly, May Not Be Relied On for Any Purpose Other Than The Determination Of How To Vote On, Or Whether To Object To, The Plan.**

**The Debtor and the Creditors Committee Believe That The Plan And The Treatment Of Claims And Interests Thereunder Is In The Best Interests Of Claimholders And Interest Holders And Urge That You Vote To Accept The Plan.**

**This Disclosure Statement Has Not Been Approved Or Disapproved By The Securities And Exchange Commission, Nor Has The Commission Passed On The Accuracy Or Adequacy Of The Statements Contained Herein. Any Representation To The Contrary Is Unlawful. The Plan Should Be Reviewed Carefully.**

C.    **Hearing On Confirmation of the Plan**

The Bankruptcy Court has set **August 28, 2013, at 10:30 a.m.**, as the time and date for the hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Claimholders and whether the other standards for Confirmation of the Plan have been satisfied. Once commenced, the Confirmation Hearing may be adjourned or continued by announcement in open court with no further notice.

## D.    Sources of Information

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtor, its business, properties and management, and the Plan have been prepared from information furnished by the Debtor. The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified.

## ARTICLE 2
## EXPLANATION OF CHAPTER 11

## A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor-in-possession may seek to reorganize its business or to sell the business for the benefit of the debtor's creditors and other interested parties.

The commencement of a Chapter 11 case creates an estate comprising all of the debtor's legal and equitable interests in property as of the date the petition is filed. Unless the Bankruptcy Court orders the appointment of a trustee, a Chapter 11 debtor may continue to operate its business and control the assets of its estate as a "debtor-in-possession", as the Debtor has done in this case since the Petition Date.

Formulation of a plan of reorganization/liquidation is the principal purpose of a Chapter 11 case. The plan sets forth the means for satisfying the claims of creditors against, and interests of equity security holders in, the debtor.

## B.    Plan Of Reorganization

Although usually referred to as a plan of reorganization, a plan may simply provide for an orderly liquidation of a debtor's property and assets. The Debtor's Plan does, in fact, provide for an orderly liquidation of its remaining assets. The Debtor in this case has already sold the vast majority of its assets. The chief remaining assets of this Debtor are: cash, accounts receivable, possible tax refund and payment under a postpetition settlement agreement by and among the Debtor, the Creditors Committee, Glenn Rockwood (the President of the Debtor) and PrenFill, LLC.

After the plan has been filed, the holders of claims against, or interests in, a debtor are generally permitted to vote on whether to accept or reject the plan. Chapter 11 does not require that each holder of a claim against, or interest in, a debtor vote in favor of a plan in order for the plan to be confirmed. At a minimum, however, a plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting from at least one class of claims impaired under the plan.

Classes of claims or interests that are not "impaired" under a plan or reorganization are conclusively presumed to have accepted the plan and therefore are

3

not entitled to vote. A class is "impaired" if the plan modifies the legal, equitable, or contractual rights attaching to the claims or interests of that class. The claims of the unsecured creditors of this Debtor are impaired and will not receive the full value of their claims. Classes of claims or interests that receive or retain no property under a plan of reorganization are conclusively presumed to have rejected the plan and therefore are not entitled to vote. The class including the shareholders of the Debtor is not receiving anything under the Plan and is deemed to have rejected the Plan.

## ARTICLE 3
## VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS

### A.   Ballots and Voting Deadline

A ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement, and has been mailed to Claimholders (or their authorized representatives) entitled to vote. After carefully reviewing the Disclosure Statement, including all exhibits, each Claimholder (or its authorized representative) entitled to vote should indicate its vote on the enclosed ballot. All Claimholders (or their authorized representatives) entitled to vote must (i) carefully review the ballot and instructions thereon, (ii) execute the ballot, and (iii) return it to the address indicated on the ballot by the deadline (the "Voting Deadline") for the ballot to be considered.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received no later than **August 19, 2013 at 5:00 p.m.** at the following address:

> McNAMEE, LOCHNER, TITUS & WILLIAMS, P.C.
> Attn:  Peter A. Pastore, Esq.
> 677 Broadway
> Albany, New York 12207

**BALLOTS MUST BE RECEIVED AT THE ABOVE ADDRESS NO LATER THAN AUGUST 19, 2013 AT 5:00 P.M.   ANY BALLOTS RECEIVED AFTER THAT DEADLINE WILL NOT BE COUNTED.**

### B.   Claimholders and Interest Holders Entitled to Vote

Any Claimholder of the Debtor whose claim is impaired under the Plan is entitled to vote if either (i) the Debtor has scheduled the Claimholder's Claim (and such Claim is not scheduled as disputed, contingent, or unliquidated) or (ii) the Claimholder has filed a Proof of Claim on or before the deadline set by the Bankruptcy Court for such filings. Any holder of a Claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court (on motion by a party whose Claim is subject to an objection), temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan. Such motion must be heard and determined by the Bankruptcy Court before the first date set by the

Bankruptcy Court for the Confirmation Hearing on the Plan.  In addition, a Claimholder's vote may be disregarded if the Bankruptcy Court determines that the Claimholder's acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

The Debtor's Interest Holders shall not receive any distribution under the Plan. Accordingly, all such Interest Holders are deemed to have rejected the Plan and are not entitled to vote on the Plan.

## C.    Bar Date for Filing Proofs of Claim

The Bankruptcy Court established a bar date for filing proofs of claim or interests in the Debtor's Chapter 11 case of February 11, 2013.

## D.    Classes Impaired Under the Plan

Claims or Interests in Classes 1, 4 and 5 are impaired under the Plan.  Holders of Claims in Class 1 and Class 4 are eligible to vote to accept or reject the Plan.  Holders of Claims in Class 2 and 3 are not impaired and may not vote on the Plan.  Interest holders within Class 5 will not receive any distributions under the Plan.  As such, Interest holders within Class 5 are conclusively presumed to have rejected the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

## E.    Information on Voting and Ballots

### 1.    Ballot Tabulation Procedures

For purposes of voting on the Plan, the amount and classification of a Claim and the procedures that will be used to tabulate acceptances and rejections of the Plan shall be exclusively as follows:

(a)    If no Proof of Claim has been timely filed, the voted amount of a Claim shall be equal to the amount listed for the particular Claim in the Schedules of Assets and Liabilities, as and if amended, to the extent such Claim is not listed as contingent, unliquidated, or disputed, and the Claim shall be placed in the appropriate Class, based on the Debtor's records, and consistent with the Schedules of Assets and Liabilities and the Claims registry of the Clerk of the Bankruptcy Court (the "Clerk");

(b)    If a Proof of Claim has been timely filed, and has not been objected to before the expiration of the Voting Deadline, the voted amount of that Claim shall be as specified in the Proof of Claim filed with the Clerk;

(c)    Subject to subparagraph (d) below, a Claim that is the subject of an objection filed before the Voting Deadline shall be disallowed for voting purposes, except to the extent and in the manner that the Debtor indicates in its objection that the Claim should be allowed for voting or other purposes;

(d)    If a Claim has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, the voted amount and classification shall be that set by the Bankruptcy Court;

(e)    If a Claimholder or its authorized representative did not use the Ballot or Master Ballot form, as applicable, provided by the Debtor, the Official Ballot Form authorized under the Federal Rules of Bankruptcy Procedure or a substantially similar form of ballot, such Ballot will not be counted;

(f)    If the Ballot is not received by the Debtor on or before the Voting Deadline at the place fixed by the Bankruptcy Court, the Ballot will not be counted;

(g)    If the Ballot is not signed by the Claimholder or its authorized representative, the Ballot will not be counted;

(h)    If the individual or institution casting the Ballot (whether directly or as a representative) was not the holder of a Claim on the Voting Record Date (as that term is defined below), the Ballot will not be counted;

(i)    If the Claimholder or its authorized representative did not check one of the boxes indicating acceptance or rejection of the Plan, or checked both such boxes, the Ballot will not be counted;

(j)    Whenever a Claimholder (or its authorized representative) submits more than one Ballot voting the same Claim(s) before the applicable deadline for submission of Ballots, except as otherwise directed by the Bankruptcy Court after notice and a hearing, the last such Ballot shall be deemed to reflect the voter's intent and shall supersede any prior Ballots.

## 2.    Execution of Ballots by Representatives

If a Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity, such persons must indicate their capacity when signing and, at the Debtor's request, must submit proper evidence satisfactory to the Debtor of their authority to so act.

## 3.    Changes to Ballots

Any Claimholder (or its authorized representative) who has previously submitted a properly completed Ballot to counsel for the Debtor before the Voting Deadline may revoke such Ballot and change its vote by submitting to counsel for the Debtor before the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

## F.    Confirmation of Plan

### 1.    Solicitation of Acceptances

The Debtor is soliciting your vote. The Debtor will bear the cost of any solicitation by the Debtor. No other additional compensation shall be received by any party for any solicitation other than as disclosed to the Bankruptcy Court.

No Representations Or Assurances, If Any, Concerning The Debtor Or The Plan Are Authorized By The Debtor Other Than As Set Forth In This Disclosure Statement. Any Representations Or Inducements Made By Any Person To Secure Your Vote Other Than Those Contained In This Disclosure Statement Should Not Be Relied On By You In Arriving At Your Decision, And Such Additional Representations Or Inducements Should Be Reported To Counsel For The Debtor For Such Action As May Be Deemed Appropriate.

This Is A Solicitation Solely By The Debtor, And Is Not A Solicitation By Any Shareholder, Attorney, Or Accountant For The Debtor. The Representations, If Any, Made Herein Are Those Of The Debtor And Not Of Such Shareholders, Attorneys, Or Accountants, Except As May Be Otherwise Specifically And Expressly Indicated.

Under the Bankruptcy Code, a vote for acceptance or rejection of a plan may not be solicited unless the claimant has received a copy of a disclosure statement approved by the Bankruptcy Court prior to, or concurrently with, such solicitation. This solicitation of votes on the Plan is governed by Bankruptcy Code Section 1125(b). Violation of Bankruptcy Code Section 1125(b) may result in sanctions by the Bankruptcy Court, including disallowance of any improperly solicited vote.

### 2.    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Bankruptcy Code Section 1129 have been satisfied, in which event the Bankruptcy Court shall enter an Order confirming the Plan. For the Plan to be confirmed, Bankruptcy Code Section 1129 requires that:

(i)    The Plan comply with the applicable provisions of the Bankruptcy Code;

(ii)    The Debtor has complied with the applicable provisions of the Bankruptcy Code;

(iii)    The Plan has been proposed in good faith and not by any means forbidden by law;

(iv)    Any payment or distribution made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan for services or for costs and expense in connection with the Plan has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)    The Debtor has disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan with the Debtor, or a successor to the Debtor under the Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and Interest Holders and with public policy; and the Debtor has disclosed the identity of any insider that will be employed or retained by the reorganized debtor and the nature of any compensation for such insider;

(vi)    With respect to each impaired Class of Claims or Interests, either each holder of a Claim or Interest of the Class has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code. If Bankruptcy Code Section 1111(b)(2) applies to the Claims of a Class, each holder of a Claim of that Class will receive or retain under the Plan on account of that Claim property of a value, as of the Effective Date, that is not less than the value of that holder's interest in the Debtor's interest in the property that secures that Claim;

(vii)    Each Class of Claims or Interests has either accepted the Plan or is not impaired under the Plan;

(viii)    Except to the extent that the holder of a particular Administrative Claim or Priority Claim has agreed to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Claims shall be paid in full on the Effective Date or the Allowed Date;

(ix)    If a Class of Claims or Interests is impaired under the Plan, at least one such Class of Claims or Interests that is entitled to vote has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Interest of that Class; and

(x)    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtor believes that the Plan satisfies all of the statutory requirements of the Bankruptcy Code for confirmation and that the Plan was proposed in good faith. The Debtor believes it has complied, or will have complied, with all the requirements of the Bankruptcy Code governing confirmation of the Plan.

### 3.    Acceptances Necessary to Confirm the Plan

Voting on the Plan by each holder of a Claim (or its authorized representative) is important. Chapter 11 of the Bankruptcy Code does not require that each holder of a Claim vote in favor of the Plan in order for the Court to confirm the Plan. Generally, to be confirmed under the acceptance provisions of Bankruptcy Code Section 1126(a), the Plan must be accepted by each Class of Claims that is impaired under the Plan by parties holding at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class actually voting in connection with the Plan. Even if all Classes of Claims accept the Plan, the Bankruptcy Court may refuse to confirm the Plan.

### 4.    Cramdown

In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its claims or equity interests. "Fair and equitable" has different meanings for holders of secured and unsecured claims and equity interests.

With respect to a secured claim, "fair and equitable" means either (i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claims with a present value as of the effective date of the plan at least equal to the value of such creditor's interest in the property securing its liens, (ii) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of sale, and such lien proceeds must be treated in accordance with clauses (i) and (iii) hereof; or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan. With respect to an unsecured claim, "fair and equitable" means either (i) each impaired creditor receives or retains property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan.

With respect to equity interests, "fair and equitable" means either (i) each impaired equity interest receives or retains, on account of that equity interest, property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of the equity interest; or (ii) the holder of any equity interest that is junior to

9

the equity interest of that class will not receive or retain under the plan, on account of that junior equity interest, any property.

In the event at least one Class of impaired Claims or Interests rejects or is deemed to have rejected the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired Class of Claims or Interests.

The Debtor believes that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired Class of Claims and Interests.

## ARTICLE 4
## BACKGROUND OF THE DEBTOR

### A.    Nature of the Debtor's Business

Debtor provided customer service and inventory fulfillment for retailers and catalog companies. Debtor primarily served as a distributor of video game hardware, software, accessories, and PC software and also offered internet fulfillment services. Debtor further provided logistic services including web site development, returns processing, account management, supply chain facilitation and integration, database development and management, product warehousing and distribution, real-time data interfaces and data exchange, pick, pack and ship, reverse logistics, package customization, and transportation management and shipment tracking. Debtor served a wide base of national retailers and software publishers. The company is based in Mechanicville, New York, and was founded in 2001 by Glenn Rockwood. Glenn Rockwood is the current President of the Debtor and owns 50% of the Debtor's Class A units, which units are the only units with voting rights.

### B.    Existing and Potential Litigation/Proceedings

The Debtor may potentially be a plaintiff in other lawsuits, claims, and administrative proceedings. While the outcome of those proceedings cannot be predicted with certainty, the Debtor reasonably estimates that the recoveries generated from, and/or the costs associated with pursuing, those claims will not materially affect the financial condition of the Debtor or the distributions to be made under the Plan.

### C.    Assets of the Debtor

The chief assets of the Debtor are: (1) real property located at 200 Fillpoint Drive, Mechanicville, New York, 12118; (2) a certain account receivable owed by Microsoft in the sum of approximately $40,000; (3) a default judgment against The Price Pros, Inc., in the amount of $45,783.97, (4) a possible tax refund for overpayment of various taxes; and (5) $315,000 in cash received by the Debtor in connection with a certain settlement agreement, which was approved by the Court on June 13, 2013 (the "Settlement Agreement"). All of said assets are the subject of the Settlement Agreement. A copy of

the Order Approving the Settlement Agreement dated June 13, 2013 is attached hereto and made a part hereof. Under the Settlement Agreement Glenn Rockwood, a principal of Debtor, was required to pay the sum of $315,000 to Debtor's law firm and in return, therefor, Mr. Rockwood obtained one hundred percent (100%) of the ownership interest in Fillpoint, LLC, including the real estate owned by the Debtor, but excluding the Microsoft receivable, the judgment against The Price Pros and any potential tax refund(s). Said $315,000 has been received by McNamee, Lochner, Titus & Williams, P.C. The Settlement Agreement provides upon the payment of $315,000 by Mr. Rockwood and the approval of the Plan contemplated herein, Mr. Rockwood shall become the sole member of the reorganized Fillpoint, LLC, and ownership of the one hundred percent (100%) of the limited liability membership interests shall become vested in Mr. Rockwood's name. The reorganized Fillpoint, LLC shall continue to operate as a single-asset real estate company going forward with all debts discharged except for the existing mortgages on Debtor's real estate held by General Electric Capital Corporation and the United States Small Business Administration.

Pursuant to the Settlement Agreement, Mr. Rockwood has paid Prenfill $190,000 and acquired Prenfill's secured claim, which claim is in excess of $230,000. Under the proposed Plan, the Debtor shall, among other things: (1) collect the $315,000 from Mr. Rockwood, (2) collect the account receivable from Microsoft in the approximate amount of $40,000, (3) attempt to collect debtor's judgment against The Price Pros and (4) collect any tax refunds owed to the Debtor (collectively "Estate Assets"). The Estate Assets shall be deposited with Debtor's law firm, i.e. Distribution Agent, and shall be distributed to the allowed administration expenses and the balance paid to priority claims and then to general unsecured claimants as a single dividend payment on their allowed claims.

Upon confirmation of a Chapter 11 Plan that distributes the Estate Assets as set forth above, Mr. Rockwood's secured claim shall be extinguished. In the event that such a Plan is not confirmed, Mr. Rockwood's secured claim shall remain in full force and effect and the Debtor shall be required to refund to Mr. Rockwood the $315,000.

Aside from the real estate and the above mentioned accounts receivable, the Debtor has few, if any, assets.

## ARTICLE 5
## EVENTS LEADING TO BANKRUPTCY

Debtor attempted to expand into the area of video game development and production. This effort proved to be unfruitful and caused the company to suffer significant financial difficulties. As a result the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 14, 2012 in the United States Bankruptcy Court for the Northern District of New York, Albany Division.

## ARTICLE 6
## POST-BANKRUPTCY OPERATIONS AND SIGNIFICANT EVENTS

### A.    Post-Bankruptcy Operations

Before the bankruptcy filing and thereafter, the Debtor and its professionals focused their efforts on (i) obtaining purchasers for the Debtor's business, (ii) obtaining a tenant for said real estate pending the confirmation of such a sale and (iii) obtaining a purchaser for the Debtor's real estate.   The Debtor did consummate two (2) sales of substantially all of the assets and inventory of the Debtor's business which yielded significant cash.   On September 14, 2012, the Bankruptcy Court approved a sale of certain inventory of the Debtor for $1,900,000.  The proceeds of that sale were utilized, *inter alia*, to pay off debtor's loan obligation to its first secured lender, i.e. Wells Fargo Bank, N.A. and portions of its loan obligation to its second secured lender, i.e. Prenfill, LLC ("Prenfill").   On September 14, 2012, the Bankruptcy Court also approved a sale of substantially all of Debtor's business assets for $2,000,000.  The proceeds of that sale were utilized to pay down the Debtor's loan obligation to its second secured lender, Prenfill.  The balance of Prenfill's debt has been paid in full by the collection of Debtor's accounts receivable and by the purchase of Prenfill's claim (which has a value in excess of $230,000) for $190,000 by Mr. Glenn Rockwood (the Debtor's President) pursuant to the Settlement Agreement.  Accordingly, Prenfill's claim has been paid in full.  Following a marketing effort by the Debtor's real estate broker Remax Park Place, the Debtor was unable to identify a serious and capable purchaser for the real estate.   As such, pursuant to the Plan, the Debtor's real property located at 200 Fillpoint Drive, Mechanicville, New York, 12118 will be owned by the Reorganized Debtor, subject to the existing mortgages and the Reorganized Debtor will be responsible for all unpaid real property taxes and other assessments against the real property.

The Debtor has continued to operate and maintain its business as a debtor-in-possession pursuant to Sections 1107 (a) and 1108 of the Bankruptcy Code.

### B.    Professional Fees and Expenses

Pursuant to an order entered by the Bankruptcy Court, the Debtor retained McNamee, Lochner, Titus & Williams, P.C. to serve as general bankruptcy counsel. Also pursuant to orders entered by the Bankruptcy Court, the Official Committee of Unsecured Creditors ("Creditors Committee") retained Otterbourg, Steindler, Houston & Rosen, P.C., as counsel, BDO Capital Advisors, LLC as investment banker and BDO Consulting, a division of BDO USA, LLP as financial advisor.

## ARTICLE 7
## DESCRIPTION OF THE PLAN

### A.    Introduction

A summary of the principal provisions of the Plan and the treatment of Classes of Allowed Claims and Interests is set out below. This Disclosure Statement is only a summary of the terms of the Plan and is entirely qualified by the Plan; it is the Plan and not the Disclosure Statement that governs the rights and obligations of the parties.

The Plan seeks to distribute all value in the Debtor's estate to creditors according to the priority scheme established by the Bankruptcy Code.

### B.    Designation of Claims and Interests

The following is a designation of the classes of Allowed Claims and Interests under this Plan. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Unsecured Tax Claims described in this Article 7, have not been classified and are excluded from the following classes. An Allowed Claim or Interest is classified in a particular class only to the extent that the Claim or Interest qualifies within the description of that class, and is classified in another class or classes to the extent that any remainder of the Allowed Claim or Interest qualifies within the description of such other class or classes. An Allowed Claim or Interest is classified in a particular class only to the extent that the Allowed Claim or Interest in that class has not been paid, released, or otherwise satisfied before the Effective Date; a Claim or Interest which is not an Allowed Claim or Interest is not in any Class. Notwithstanding anything to the contrary contained in this Plan, no distribution shall be made on account of any Claim or Interest which is not an Allowed Claim or Interest.

|  | **Class** | **Status** |
|---|---|---|
| I. | **Secured Claims** | |
| | Class 1:  Secured Claim of Glenn Rockwood | Impaired - entitled to vote ($0.00 in distribution) |
| | Class 2:  Secured Claim of Mortgagees | Unimpaired - not entitled to vote; to be paid in accordance with their respective notes and mortgages |

13

## II.    Unsecured Claims

Class 3:  Priority Tax Claims                          Unimpaired - not entitled to vote;
                                                       to be paid in full, amount of
                                                       claims total $965.65

Class 4:  General Unsecured Claims                     Impaired - entitled to vote; 0.5%
                                                       to 1.5% distribution

## III.    Interests

Class 5:    Equity Interests Impaired – deemed to have voted against the Plan; $0.00 in
distribution

## C.    Treatment of Unclassified Claims

### 1.    Administrative Expense Claims.

a.    **General**.    Subject to the bar date provisions herein, unless
otherwise agreed to by the parties, each holder of an Allowed Administrative Claim shall
receive Cash equal to the unpaid portion of such Allowed Administrative Expense Claim
on the later of (a) the Effective Date or as soon as practicable thereafter, (b) the
Allowance Date, (c) such date as is mutually agreed upon by the Debtor and the holder
of such Claim, and (d) the Distribution Date.

b.    **Payment of Statutory Fees**.    All fees payable pursuant to 28
U.S.C. §1930 shall be paid in Cash equal to the amount of such Administrative Expense
Claim when due.

c.    **Bar Date for Administrative Expense Claims**.

(1)    General Provisions. Except as provided below in Sections
3.1(c)(iii) of the Plan, requests for payment of Administrative Expense Claims must be
filed no later than **twenty (20) days after the Effective Date**.  Holders of Administrative
Expense Claims (including, without limitation, professionals requesting compensation or
reimbursement of expenses and the holders of any Claims for federal, state or local
taxes) that are required to File a request for payment of such Claims and that do not
File such requests by the applicable bar date shall be forever barred from asserting
such Claims against the Debtor or any of their respective property.

(2)    Professionals.    All professionals or other entities
requesting compensation or reimbursement of expenses pursuant to Sections 327, 328,
330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered before the
Effective Date (including, without limitation, any compensation requested by any
professional or any other entity for making a substantial contribution in the
Reorganization Case) shall File and serve on the Debtor and Post-Confirmation Service

List an application for final allowance of compensation and reimbursement of expenses no later than twenty (20) days after the Effective Date. Objections to applications of professionals for compensation or reimbursement of expenses must be filed and served on the Debtor and the professionals to whose application the objections are addressed no later than thirty (30) days after the Effective Date. Any professional fees and reimbursements or expenses incurred by the Debtor subsequent to the Effective Date may be paid without application to the Bankruptcy Court.

       (3)   <u>Tax Claims</u>. All requests for payment of Administrative Expense Claims and other Claims by a governmental unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date ("Post-Petition Tax Claims") and for which no bar date has otherwise been previously established, must be Filed on or before the later of (i) 20 days following the Effective Date; and (ii) 30 days following the filing with the applicable governmental unit of the tax return for such taxes for such tax year or period. Any holder of any Post-Petition Tax Claim that is required to File a request for payment of such taxes and does not File such a Claim by the applicable bar date shall be forever barred from asserting any such Post-Petition Tax Claim against the Debtor or its property, whether any such Post-Petition Tax Claim is deemed to arise prior to, on, or subsequent to the Effective Date. To the extent that the holder of a Post-Petition Tax Claim holds a lien to secure its Claim under applicable state law, the holder of such Claim shall retain its lien until its Allowed Claim has been paid in full.

## C.    Treatment of Classified Claims and Interests

### 1.    Class 1 - Allowed Secured Claim of Glenn Rockwood

    **a.**    **Classification**:   Class 1 Consists of the Allowed Secured Claim of Glenn Rockwood in the sum of $225,000.

    b.    **Treatment**: Claim 1 is impaired and the holder of the Allowed Claim in Class 1 is entitled to vote on the Plan. Class 1 shall waive its secured claim and voluntarily forego any distributions under the Plan provided that the Plan is confirmed and Class 3 accepts the Plan. Should Class 3 not accept the Plan or the Plan is not otherwise confirmed, Class 1 reserves its secured claim and all rights appertaining thereto.

### 2.    Class 2 - Secured Claims of Mortgagees

    **a.**    **Classification**:   Class 2 Consists of the Allowed Secured Claims of the United States Small Business Administration in the approximate sum of $850,000 and General Electric Capital Corporation in the approximate sum of $1,350,000.

b.      **Treatment**: Class 2 claimants are unimpaired and holders of allowed claims in Class 2 are not entitled to vote.   The Reorganized Debtor shall continue to make payments to said secured creditors in accordance with the respective notes and mortgages.

3.      **Class 3 - Allowed Tax Priority Claims**

a.      **Classification**: Class 3 Consists of the Allowed Non-tax Priority Classes.

b.      Treatment: Class 3 is unimpaired and holders of Allowed Claims in Class 3 are not entitled to vote on the Plan.  Each Allowed Priority Non-Tax Claim shall be paid by the Debtor in full.

4.      **Class 4 – General Unsecured Claims**

a.      **Classification**:      Class 4 consists of the Allowed General Unsecured Claims.

b.      **Treatment**:   Class 4 is impaired and the holders of Allowed General Unsecured Claims are entitled to vote on the Plan.  On the Distribution Date and from time to time thereafter, the holders of Allowed General Unsecured Claims shall each receive their Pro Rata Share of the Available Cash; provided however that there shall be no distributions to holders of Allowed Class 4 Claims unless all Allowed Administrative and Allowed Priority Claims have been paid in full and the Distribution Reserve is fully funded as to Disputed Administrative and Priority Claims and the projected operating expenses of the Debtor.

5.      **Class 5 – Equity Interests**

a.      **Classification**: Class 5 consists of all Equity Interests.

b.      **Treatment**:  The holders of Equity Interests are impaired but are not entitled to vote on the Plan. All Equity Interests will be cancelled, and Glenn Rockwood, or his assigns, shall, upon the effective date of the Plan, become the sole member of the reorganized Debtor.  Fillpoint, LLC shall continue to operate as a single asset real estate company going forward with all debts discharged except for the existing mortgages on the Debtor's real property held by General Electric Capital Corporation and the United States Small Business Administration.

D.      **Establishment of Reserves**

The Plan provides for the creation of a Distribution Reserve to protect holders of Disputed Claims in the event that there are sufficient funds to make a distribution to creditors with claims of the same priority.  To the extent such funds become available, a reserve will be created for Disputed Unsecured Claims so that all unsecured creditors

will share ratably in any distribution. The Distribution Reserve will include, in one or more accounts of the Debtor, Cash equal to the aggregate of (a) Cash that would have been distributed on the Distribution Date on account of Disputed or undetermined (i) Administrative Expense Claims had they been Allowed Claims, provided that with respect to Administrative Expense Claims for which applications for compensation of professionals or others retained or to be compensated pursuant to Sections 327, 328, 330, 331 and 503(b) of the Bankruptcy Code are or will be pending but are then undetermined, the amount of Cash deposited shall be the amount sought by such persons or the maximum amount such persons indicate that they intend to apply for, (ii) Priority Claims, (iii) General Unsecured Claims plus (b) Earned Interest on all Cash in the Distribution Reserve, plus (c) Cash in the amount of the sum of the estimated out-of-pocket fees and expenses of, or to be incurred by, the Debtor, plus (d) Cash in the amount of all taxes previously incurred by the Debtor (and not paid or otherwise provided for under the Plan) and all taxes and professional fees estimated to be incurred by the Debtor, including professional fees of the Debtor; plus (e) Cash in the amount of all estimated costs and expenses of effectuating the corporate actions contemplated by Article 7 of the Plan, plus (f) Cash in the amount of the estimated operating expenses of the Debtor.

### E.     Treatment of Executory Contracts

All Executory Contracts of the Debtor that have not previously been assumed or rejected will be deemed rejected as of the Petition Date. The Debtor will ask the Court to set a bar date of twenty (20) days after the Effective Date for the filing of claims for damages arising out of rejection of any remaining contracts.

### F.     Releases by Debtor

**Released Parties**: means collectively and in each case in their capacity as such: (a) the Debtor; (b) the Estate; (c) the Creditors Committee, (d) Glenn Rockwood (the Debtor's President); and (e) with respect to each of the foregoing entities in clauses (a) through (d), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

As of the Effective Date, except for the right to enforce the Plan and any related documents, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by Debtor, the Reorganized Debtor, and the Estate from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or

assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtor, the Reorganized Debtor, the Estate or its affiliates (if any) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation or preparation of the Plan, or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud.

## G.    Releases by Holders of Claims and Interests

As of the Effective Date, except for the right to enforce the Plan and any related documents, each holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Chapter 11 Case, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation or preparation of the Plan, or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud.

## H.    Exculpation and Limitation of Liability.

The Released Parties (each, an "Exculpated Party") shall neither have nor incur any liability to any Person or Entity for any action taken or omitted to be taken after the Petition Date in connection with or related to the Chapter 11 Case including, without limitation, the preparation and filing of the Chapter 11 Case, or the formulation, preparation, dissemination, implementation, Confirmation, or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan; provided, however, that

the exculpation provided for in Article VII of the Plan shall not affect or modify any obligations created under this Plan, any obligations under the Settlement Agreement, or the rights of any Holder of an Allowed Claim to enforce its rights under this Plan and shall not release any action or inaction constituting willful misconduct or gross negligence, in each case subject to the determination of such by final order of a court of competent jurisdiction; provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities, if any, under this Plan and such reasonable reliance shall form an absolute defense to any such claim, Cause of Action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the benefits and protections of section 1125(e) of the Bankruptcy Code.

## ARTICLE 8
## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

The Plan contemplates an orderly and efficient liquidation of the Debtor's remaining assets and distribution of the proceeds to holders of Allowed Claims in accordance with the priority scheme established by the Bankruptcy Code. Debtor will take responsibility for collecting the cash generated by the Settlement Agreement, the Microsoft account receivable, the Price Pros judgment and tax refunds ("Estate Assets"), and making distributions to holders of Allowed Claims.

Except as otherwise expressly limited in the Plan, the Distribution Agent shall have control and authority over the Estate Assets, and over the management and disposition of the Estate Assets. The Debtor will supervise the filing and resolution of claim objections.

## ARTICLE 9
## RECOVERY ANALYSIS, FEASIBILITY AND RISKS

### A.    Recovery Analysis and Feasibility

Recoveries to holders of Unsecured Claims are subject to many variables at this point.  First, recoveries to holders of Unsecured Claims are dependent on the Debtor having sufficient funds to pay all Allowed Administrative and Priority Claims after paying the costs that the Debtor incurs in administering the post-confirmation assets. The Debtor may incur expense in objecting to Administrative and Priority Claims that are disputed. Important variables affecting the recovery to holders of Unsecured Claims are (i) the total amount of expenses of the Debtor, (ii) the total amount of Allowed Claims entitled to payment before payments to holders of Unsecured Claims, and (iii) the total amount of Allowed Unsecured Claims.

### B.    Risks Associated with the Plan.

Both the confirmation and consummation of the Plan are subject to a number of risks.  Specifically, if certain standards set forth in the Bankruptcy Code are not met, the

Bankruptcy Court will not confirm the Plan even if Claimholders accept the Plan. Although the Debtor believes that the Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court were to determine that such requirements were not met, it could require the Debtor to re-solicit acceptances, which could delay and/or jeopardize confirmation of the Plan. The Debtor believes that the solicitation of votes on the Plan will comply with Section 1126(b) and that the Bankruptcy Court will confirm the Plan. The Debtor, however, can provide no assurance that modifications of the Plan will not be required to obtain confirmation of the Plan, or that such modifications will not require a resolicitation of acceptances.

## ARTICLE 10
## ALTERNATIVES TO PLAN

There are two possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtor's Chapter 11 case, or (b) the Debtor's Chapter 11 case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code.

### A.    Dismissal

If the Debtor's Chapter 11 case was dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. Dismissal would force a race among creditors to take over and dispose of any remaining assets. Because smaller creditors would not have an equal incentive to expend significant funds in pursuing the Debtor's remaining assets, they would undoubtedly receive less or nothing on their Claims. The Debtor believes that the dismissal of the Chapter 11 case will result in far smaller distributions or distributions being realized by the Unsecured Creditors of this estate than the distributions provided for in the Plan.

### B.    Chapter 7 Liquidation

If the Plan is not confirmed, it is likely that the Debtor's Chapter 11 case will be converted to a case under Chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. Whether a bankruptcy case is one under Chapter 7 or Chapter 11, secured creditors, Administrative Claims and Priority Claims are entitled to be paid in cash and in full before unsecured creditors receive any funds.

If the Debtor's Chapter 11 case is converted to Chapter 7, the present Administrative Claims may have a priority lower than priority claims generated by the Chapter 7 case, such as the Chapter 7 trustee's fees or the fees of attorneys, accountants and other professionals engaged by the trustee. The Debtor believes that conversion to Chapter 7 is likely to result in higher costs of administration than

confirmation of the Plan. First, the Chapter 7 Trustee will receive a percentage of the money distributed to holders of Allowed Claims as compensation.    The Chapter 7 Trustee will have to retain attorneys.   The Chapter 7 Trustee will also likely have to retain accountants in connection with making claim reconciliations, filing necessary tax returns and otherwise closing the Estate.

## ARTICLE 11
## CERTAIN UNITED STATES FEDERAL INCOME TAX
## CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtor and Claimholders. This discussion is based on the Internal Revenue Code of 1986, as amended, Treasury regulations, judicial decisions, and published rulings and pronouncements of the IRS in effect on the date of this Disclosure Statement. Changes in those rules, or new interpretations of those rules, may have retroactive effect and could significantly affect the federal income tax consequences described below.

The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.   There can be no assurance that the IRS will agree with this discussion of material federal income tax consequences.  In addition, this summary does not address state, local or foreign tax consequences of the Plan, and it does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, insurance companies, financial institutions, small business investment corporations, regulated investment companies, tax-exempt organizations, or investors in pass through entities).

**THE FOLLOWING SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A PARTICULAR CLAIMHOLDER. ALL CLAIMHOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS IN DETERMINING THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES TO THEM UNDER THE PLAN.**

### B.    Material Tax Consequences to the Debtor

Generally, under the terms of the Plan, all Claims will be released except to the extent that the Debtor has cash available to satisfy all or a portion of such Claims. Any income resulting from the satisfaction of any Claim at a discount will not constitute taxable income to the Debtor because the debt forgiveness arises in connection with a bankruptcy case under Title 11 of the United States Code.

**C.      Material Tax Consequences to Creditors**

In General.    The federal income tax consequences of the implementation of the Plan to a Creditor will depend, among other things, on (a) whether the Creditor receives consideration in more than one tax year, (b) whether the Creditor is a resident of the United States, (c) whether all of the consideration by the Creditor is deemed to be received by that Creditor as part of an integrated transaction, (d) whether the Creditor reports income using the accrual or cash method of accounting, and (e) whether the Creditor has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

Gain or Loss on Exchange.       Generally, a Creditor will realize a gain or loss on the exchange under the Plan of its Claim for cash in an amount equal to the difference between (i) the cash received by the Creditor (other than any cash attributable to accrued but unpaid interest on the Claim), and (ii) the Creditor's adjusted basis in the Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain or loss recognized will be a capital gain or loss if the Claim was a capital asset in the hand of the Creditor, and such gain or loss will be a long-term capital gain or loss if the Creditor's holding period for the Claim surrendered exceeds one (1) year at the time of the exchange.

Payments Attributable to Interest. A Creditor not previously required to include in its taxable income any accrued but unpaid interest on a Claim may be treated as receiving taxable interest, to the extent the cash it receives pursuant to the Plan is allocable to such accrued but unpaid interest. A Creditor previously required to include in its taxable income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss, to the extent the amount of interest actually received by the Creditor is less than the amount of interest taken into income by the Creditor.

Section 1145 Exemption.    The issuance of and the distribution under the Plan of equity interests, if any, shall be exempt from registration under the Securities Act of 1933 or applicable securities laws without further act or action by any Person pursuant to section 1145(a) of the Bankruptcy Code.

**D.      Information Reporting and Backup Withholding**

Under the backup withholding rules of the Internal Revenue Code, Creditors may be subject to backup withholding at the rate of twenty-eight percent (28%) with respect to payments made pursuant to the Plan unless such Creditor (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income. Any amount withheld under these rules will be credited against the Creditor's federal income tax liability. Creditors may be required to establish exemption from

backup withholding or to make arrangements with respect to the payment of backup withholding.

## ARTICLE 12
## CONCLUSION

This Disclosure Statement has attempted to provide information regarding the Debtor's bankruptcy estate and the potential benefits that might accrue to holders of Claims against and Interests in the Debtor under the Plan as proposed. The Plan provides for the orderly liquidation of the Debtor's remaining assets and the distribution of the proceeds in accordance with the priority scheme established by the Bankruptcy Code. The Debtor urges interested parties to vote in favor of the Plan.


DATED: July 24, 2013
      Albany, New York

             DEBTOR AND DEBTOR- IN-POSSESSION
             FILLPOINT, LLC.

             By:_____
               Glenn Rockwood, Its President


             McNAMEE, LOCHNER, TITUS & WILLIAMS, P.C.

             By:_____
               Peter A. Pastore, Esq.
             ATTORNEYS FOR DEBTOR AND
             DEBTOR-IN-POSSESSION
             677 Broadway
             Albany, New York 12207
             Tel. No. 518-447-3200

## LIQUIDATION ANALYSIS*
## FILLPOINT, LLC
## Case No. 12-12129

### July 10, 2013

| Assets | Estimated Market Value | Liquidation Value | Security Interest |
|---|---|---|---|
| 200 Fillpoint Drive Malta, New York | $3,000,000.00 | $2,200,000.00[1] | $  225,000.00[2] $2,296,710.00[3] |
| Receivables | $    40,000.00 | $    24,000.00 | $        0.00[4] |
| Miscellaneous[5] | $      1,000.00 | $        0.00 | $        0.00[4] |
|  | $3,041,000.00 | $2,224,000.00 | $2,521,710.00 |

- Cost of administration (both Chapter 11 and in the event of a Chapter 7 liquidation)    =    $100,000.00

- Funds available to unsecured creditors in the event of a Chapter 7 liquidation    =    $      0.00

\* See also discussion in Debtor's Motion for an Order Authorizing a Certain Settlement Agreement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy (ECF No. 169), which is incorporated herein by reference.

---

[1] An estimate for a forced sale, net of carrying costs and brokerage fees; at the end of August, current tenant is vacating and Estate will need to pay mortgage payments, taxes and insurance on 200 Fillpoint Drive.

[2] Includes secured claim of Prenfill, LLC, purchased by Glenn Rockwood ("Prenfill Claim").

[3] Includes first mortgage claim of General Electric Capital Corporation of $1,446,710, and second mortgage claim of U.S. Small Business Administration in the sum of $841,000.

[4] Assumes Prenfill secured claim is paid in full from Real Estate proceeds.

[5] Potential proceeds of judgment against The Price Pros Inc.